## MITCHELL CASTILO et al., Appellants, v. STATE HIGHWAY COMMISSION OF MISSOURI.

### In Banc, December 30, 1925.

1. **CAPACITY TO SUE:** Taxpayers and Citizens: Injunction. Resident taxpayers of two counties, who sue on behalf of themselves and all resident citizens and assessed taxpayers of the State similarly situated and interested in the cause of action set forth in the petition, have legal capacity to bring and maintain an injunction suit to restrain the State Highway Commission from constructing a cross-state highway upon a route alleged to be different from that · prescribed by statute.

2. ———: ———: ———: Increase of Taxes: Pleading. Failure to allege the ultimate fact that plaintiffs' taxes will be increased by the illegal acts of public officers is not material where this conclusion necessarily arises from the facts sufficiently pleaded.

3. ———: Taxpayers: Construction of Roads: Automobile Tax: Definition: Pleading. In a suit brought by resident taxpayers to enjoin the State Highway Commission from constructing a cross-state highway on a route alleged to be different from that prescribed by statute it is of no importance that the petition does not disclose that plaintiffs are owners of automobiles. The roads lawfully designated will have to be constructed and maintained out of funds raised to replace money unlawfully diverted, and by Section 44-a of Article IV of the Constitution authorizing the issuance of sixty million dollars of road bonds it was declared that "said bonds and the interest that will accrue thereon shall be paid out of a fund to be provided by the levy and collection of a direct annual tax upon all taxable property in the State," and a taxpayer is a person chargeable with a tax, or a person owning property in the State subject to taxation and on which he regularly pays taxes.

Castilo v. State Highway Commission.

4. **STATE HIGHWAY: Higher-Type Roads: Change of Route: Power of Commission.** The State Highway Commission was given power by the Act of 1921 (Laws 1921, 1st Ex. Sess., pp. 131-167), in the interest of economy and directness of route, to so change the route of a highway of the higher type connecting the principal population centers as to miss county-seat towns named in the act. [BLAIR, C. J., and ATWOOD, RAGLAND and WHITE, JJ., concurring; GRAVES and WALKER, JJ., dissenting; OTTO, J., not sitting.]

5. **STATE HIGHWAY SYSTEM: Location of Routes: Higher-Type Roads: Power of Commission.** Section 29 of the Act of 1921 (Laws 1921, 1st Ex. Sess., pp. 131-167), says: "There is hereby created and established a state-wide connected system of hard-surfaced public roads extending into each county of the State, which shall be located, acquired, constructed, re-constructed and improved . . . along the following described routes: . . . Beginning on the Missouri River at Rocheport, thence east through Columbia to the Callaway-Boone county line west of Millersburg . . . Beginning at the Callaway-Boone county line near Millersburg, thence south and east through Millersburg to Fulton, thence north and east through Calwood to Williamsburg to the Callaway-Montgomery county line . . . Beginning at the Montgomery-Callaway county line west of Mineola, thence easterly to Mineola, thence northeasterly to Danville, thence south and east through High Hill and Jonesburg to the Montgomery-Warren county line. . . . Beginning at the Warren-Montgomery county line near Jonesburg, thence south and east through Warrenton to the Warren-St. Charles county line. . . . Beginning at the Warren-St. Charles county line east of Warrenton, thence in an easterly direction to St. Charles . . . : Provided, that the highway commission is authorized and empowered to designate the routes and types of the higher type roads of approximately 1500 miles connecting the principal population centers of the State, and to make such changes in the routes of said roads as it may deem necessary in the interest of economy and directness of routes, and is authorized to commence the construction of said higher-type roads at such place or places on such routes as it may deem advisable: Provided further, that no changes in designation shall increase the total mileage of the State highway system." In much the same manner said Section 29 outlined the roads for each county in the State, north, south, east and west, beginning at the county line at or near a designated village or other point and extending through the county seat to the opposite county line. The entire length of all highways so outlined was 7,600 miles. Section 26 declared that "construction shall begin as nearly as possible and practicable at the same time in each of

Castilo v. State Highway Commission.

the several counties, and allotment or apportionment of the funds," including Federal aid, "shall be made to each and every county at the same time," and that "to each county shall be apportioned an amount to be ascertained by multiplying the total number of miles of the state-wide system of roads in such county, as designated herein, by $6,000" and that "in making the apportionment the commission, after estimating the amount required to build such roads in each county, shall use such estimate as a basis of apportionment of two-thirds of such funds, but in no case shall such estimate be less than $6,000 per mile: . . . Provided that not to exceed one-third of all such funds as they become available may be used in the construction of approximately fifteen hundred miles of higher-type roads connecting the principal population centers, which roads shall be designated before any apportionment herein provided for is made," and "provided, however, that for the construction of such higher-type roads, not to exceed $6,000 per mile thereof shall be taken from said remaining two-thirds of such available funds." The act was passed in pursuance of the constitutional amendment of 1921 by which bonds to the amount of sixty million dollars were voted "for the purpose of constructing hard-surfaced public roads, in each county of the State." The question for decision is whether the Commission has power, in the construction of a cross-state road of the higher-type between Rocheport and St. Charles, to so vary the route from that above outlined as to miss Fulton, Warrenton and other towns mentioned, from one to six miles.

*Held*, by ATWOOD, J., with whom BLAIR, C. J., concurs, that said provisos to Section 29 and other parts of the act, in so far as they relate to roads of the higher-type, are not contradictory, but give the Commission, in the interest of economy and directness of route, power, at least, to select the routes of higher-type roads.

*Held*, by RAGLAND, J., concurring, that the act does not contemplate two highway systems, but one with two objectives, the dominant purpose being to create an inter-county system of connected hard-surfaced public roads co-extensive with the State, and the secondary purpose being to connect the principal centers of population by higher-type roads than can be constructed generally with the available funds, so far as that can be done with fifteen hundred miles of such roads; that, having created the state highway system from the routes specifically laid out in the several counties, the act empowers the Commission to designate such of these routes as are to be used for the construction of the higher-type roads, and after so selecting them to make such changes in them as it may deem necessary "in the interest of economy and directness of route," but does

Castilo v. State Highway Commission.

not empower the Commission to wholly ignore the legisla-
tive-designated routes; and that the state highway system was
not made up of public roads existing at the time the act was
passed, but by Section 29, declaring that "there is hereby
created and established a state-wide system of hard-surfaced
public roads . . . which shall be located, acquired, con-
structed, re-constructed and improved . . . along the fol-
lowing described routes," it established the general routes, but
designated the routes only by naming points and general direc-
tions, but the general directions are only incidental, performing
no other function than that of identifying the points desig-
nated.

*Held,* by GRAVES, J., dissenting, with whom WALKER, J., concurs,
that the act itself locates and fixes the highway routes, and
designates certain towns through which they must pass, wheth-
er they be higher-type or other hard-surfaced roads, and
the provisos of Section 29 cannot be construed to authorize the
Commission to change these legislative designations, nor when
the two provisos are read together do they have any such mean-
ing, and especially do they have no such meaning when they
are read in connection with the other parts of the act and the
preceding acts and the constitutional provision.

*Held,* by WALKER, J., dissenting, that the dominating purpose of
the Act of 1921 and of the constitutional amendment out of
which it grew is the convenience, and in consequence the bene-
fit, of the people in the different parts of the State through
which the roads are required to be built, and unless the roads,
and especially those higher-type roads "connecting the principal
population centers," are constructed through county seats,
that dominating purpose is ignored; and that the Highway
Commission, being a mere administrative body, has no power
either to disregard the clear words of the mandatory act, or the
dominating purpose of its general scope, or its clear prescrip-
tions that the "described route" shall be through those named
towns which are county seats.

6. ———: ———: ———: ———: Provisos: **Office and Meaning.**
*Held,* by ATWOOD, J., with whom BLAIR, C. J., concurs, that a
proviso may be either a restriction or an enlargement of the
preceding parts of an act, and that the word "provided" does
not in and of itself convert the words following it into a pro-
viso, but may be used in a conjunctive sense and precede an
out-and-out grant of power; and that the words of said Section
29 following the word "provided" would be entirely meaningless
unless they are construed to authorize the Commission to lo-
cate, in the interest of economy and directness of route, a

higher-type road between population centers, and when they are read in connection with the title and the whole body of the act it is clear they give the Commission such power.

*Held*, by RAGLAND, J., that the proviso of Section 29 does not perform any unusual function in making the legislative intention manifest, nor does it authorize the Commission to wholly disregard a legislative-designated route, but only provides that such of the legislative routes as may thereafter be selected for higher-type roads may be changed.

*Held*, by WHITE, J., that a proviso is a modification of what has gone before, and to have any operative effect must make a change therein; but the Commission was given power by preceding parts of the Act of 1921 to locate the roads, and the only office of the proviso of Section 29 was to empower the Commission to designate the higher-type routes, and in doing so to "change" designated routes, where, in the interest of economy and directness, a change is necessary.

*Held*, by GRAVES, J., dissenting, with whom WALKER, J., concurs, that the purpose of a proviso is not to extend the act, but to limit it and the powers granted by it, or by way of exception withdraw something previously granted; it creates no new powers, but only limits or restricts the antecedent powers; that the second of the provisos to Section 29 declaring that "no changes in the designation shall increase the total mileage of the state highway system" limits and interprets the first, and denies to the Commission power to increase the mileage of the system established from county to county, and makes clear that by the first proviso the Commission was simply given power to hard-surface and make of a higher-type such portions of the roads established by the previous part of the section as it sees fit, but none to abandon them altogether, but is required to pursue a route which leads from town to town named in the act.

---

Highways, 29 C. J., Section 312, p. 587, n. 28; Section 332, p. 599, n. 58. Statutes, 36 Cyc., p. 1163, n. 59.

Appeal from Cole Circuit Court.—*Hon. Henry J. Westhues*, Judge.

AFFIRMED.

*C. W. Wilson, W. C. Irwin* and *Emil P. Rosenberger* for appellants.

(1)  "That the plaintiffs have no capacity to sue," being the first ground of defendant's demurrer, is utterly without merit.  The right of assessed taxpaying citizens to maintain such an action in this State has been beyond question since the decision in Newmeyer v. Railroad, 52 Mo. 81.  See also: Book v. Earl, 87 Mo. 246; State ex rel. v. Woodside, 254 Mo. 580; Harris v. Langford, 277 Mo. 527; Carson v. Sullivan, 254 Mo. 580; State v. Edwards, 244 S. W. 802; State ex rel. v. Buchanan County, 247 S. W. 802; Crampton v. Zabriskie, 101 U. S. 601.  (2) What we have just said is a complete answer to the second ground of defendant's demurrer. The plaintiffs' right to maintain the action being clear, there is no defect of parties plaintiff.  (3)  There is no defect of parties defendant.  The act creating the State Highway Commission, provides: "The Commission may sue and be sued in its official name, and for the purpose of suit and other legal proceedings service may be had on the secretary." Laws 1921, Ex. Sess., p. 136, sec. 12.  The law requires the joinder of no other party.  (4)  The fourth and fifth grounds of the demurrer, viz: "That the petition does not state facts sufficient to constitute a cause of action," and that "there is no equity in the plaintiffs' petition," we consider together, and submit: (a)  The facts alleged in the petition of the plaintiffs are confessed by the demurrer.  If a party takes his objection by demurrer to a petition, on the ground that it does not state facts, etc., he is thereby deemed to confess the truth of its allegations, denying only their legal sufficiency.  Butler v. Lawson, 72 Mo. 248; Dodson v. Lomax, 113 Mo. 555; Verdier v. St. Louis, 131 Mo. 74.  (b)  If the facts alleged are true, the petition shows ample grounds for equitable relief.  The plaintiffs, as resident taxpaying citizens, suing for themselves and other taxpaying citizens similarly concerned, are entitled to have the Commission restrained from misappropriating or wrongly expending

the public funds.  And the facts alleged standing con-
fessed, the plaintiffs are entitled to the relief prayed,
unless the Act of August 4, 1921, be held to authorize the
Commission to ignore the roads established, designated
and definitely described in the law itself, as the State
Highway System, and to establish entirely new routes for
fifteen hundred miles of roads of the higher type.  The
whole controversy turns upon a proper interpretation
of the act, Laws 1921, Ex. Sess., pp. 131 to 167.  (5)  . The
cardinal rule for the interpretation of statutes is to as-
certain the intention of the Legislature and carry that
intention into execution.  State ex rel. v. Gmelich, 208 Mo.
159; State ex rel. Marquette Hotel Inv. Co. v. State Tax
Com., 282 Mo. 213.  (a)  The intent of the Legislature
is to be determined from a consideration of all the provi-
sions of the act.  Grimes v. McReynolds, 188 Mo. 688. (b)
Such a construction should be given as will keep all provi-
sions of the law on the same subject in harmony.  In re
Kinsella's Estate, 239 S. W. 818.  (c)  And the statute
should be so construed as that all parts of it will be given
a meaning and effect.  State ex rel. King v. Board of
Trustees, 184 S. W. 929.  (d)  The purpose of a law
controls its interpretation, where its wording is not plain.
Buck v. Union Trust Co., 267 Mo. 644; Lusk v. Public
Service Com., 277 Mo. 264.

*N. T. Cave, amicus curiae.*

(1)  To get a clearer conception and understanding
of what the Legislature of 1921 meant and intended, it
is well to consider the road laws as passed in 1917 and
1919.  In 1917, Laws 1917, pp. 485 to 491, the Legisla-
ture created a highway department with certain powers
and duties, for the purpose of "giving assent to an Act
of Congress of the United States, entitled: 'An Act to
provide that the United States shall aid the states in the
construction of rural post roads and for other pur-
poses.'"  This act created our state highway depart-
ment, and by Section 8 authorized the "highway engi-

neer,'' subject to the approval or change or rejection of the highway board, to ''select and designate not less than 3,500 miles of roads in this State and, when sufficient State funds are available, shall be extended at least 500 miles annually, distributed among the several counties substantially in proportion to their respective areas, population and mileage of county roads, to be known as State roads.'' This Act further provided for the surveying, platting and construction of said State roads of not less than ''3,500 miles.'' Pursuant to that authority, the highway engineer and the highway board, under that law, did select, designate, survey and build or maintain a substantial part of that state road system, a part of which is the road described in appellants' petition in this case. The court will observe that under this 1917 road law, as above mentioned, there was no legislative designation of routes, but such designation and selection was left to the highway engineer and the highway board. In 1919 the Legislature repealed a substantial part of the 1917 road law above referred to, and enacted in lieu thereof certain provisions relative to the highway department, which are found on pages 650 to 660 of Laws 1919. By the terms and provisions of Section 8 of this law the highway engineer, subject to the approval of the board, had the right and authority to ''select and designate approximately 6,000 miles of roads in this State for construction during the years of 1919, 1920 and 1921, distributed among the several counties in this State substantially in proportion to their respective areas, and mileage of county roads, to be known as state roads.'' That section further provided that ''two of the said state roads shall run through each county, connecting with the state roads of surrounding counties and states.'' And it further provided for the surveying, platting and building of said State Highway System, and under the authority of this law the chief highway engineer and the board did select, survey and plat the state road system as they were authorized to do, and the road in dispute in appellants' petition was a

part of that designation. (2) The general purposes and intent of the road law of 1917 and 1919 were to take advantage of and benefit by Federal aid which was being extended to the respective states for the purpose of building and improving "rural post roads," which, of course, radiated from centers of population where a postoffice is located. Most of these roads had been designated by the chief engineer under the above acts, and many of them had been built, or much work and public money had been expended upon them. (3) At the general election in 1920, Joint and Concurrent Resolution No. 9 was adopted by the voters, amending Section 44a of Article 4 of the Constitution, providing for the issuance of sixty million dollars of bonds, "for the purpose of constructing hard-surfaced public roads in each county of the State." It further provided that "the Legislature shall enact such laws as may be necessary to carry into effect this amendment." Therefore, by the constitutional amendment adopted by the people, each county of the State was guaranteed a hard-surfaced public road, and it was the Legislature's duty to enact legislation as would consummate that guaranty. (4) Pursuant to that authority and limited by the provisions of that constitutional amendment, the Legislature proceeded to enact the road law approved August 4, 1921. The great outstanding difference in this road law and that of the 1917 and 1919 acts is Section 29; or is that the Legislature did not leave to the highway engineer or the Highway Commission the right and authority to "select and lay out the State Highway System," but on the contrary the Legislature, in that section, specifically "established and laid out a state-wide, connected system of hard-surfaced public roads extending into each county of the State." (5) Section 14 of this road law sets out in detail the powers, duties and authority of the State Highway Commission, and the fact that this section is wholly silent in giving the Commission any right or authority to "designate or lay out" any system of roads should be indicative of the

legislative intent on that particular point. On the contrary, Subsection 11 of Section 14 provides that the Highway Commission shall "have power to construct, under its own direction and supervision, all roads, culverts or bridges, or any part thereof, as hereinafter provided." This would seem to indicate that the Legislature did not intend for the Highway Commission to have any right or authority to designate, lay out or construct any roads that were not provided for in the act. (6) Section 26 of the Act has many provisions which would seem to throw light on the question involved herein. It provides that when the Highway Commission has apportioned and allotted the road funds to each county then that fund "shall be and become immediately available and shall be expended as provided by law for construction work upon the roads and highways designated in each county for construction or improvement as state highways, or for the purpose of refunding where roads have already been constructed." It further provides that "the funds apportioned, allotted and set apart for construction of such state roads, shall be expended only in the county for the benefit of which same are so apportioned, allotted and set apart." It further provides that the apportionment due each county is to be ascertained "by multiplying the total number of miles of the state-wide system of roads in such county, as designated herein, by $6,000." It would seem from the above quotations that the Legislature intended that the money apportioned to each county should be expended in the construction of roads upon the designation in each county and that the whole amount thereof should be expended within the county to which it had been allotted; and that each county was entitled to a minimum allotment of $6,000 per mile for each mile of state roads, "as designated herein," which means the designation made by the Legislature in Section 29, and not any designation made by the Commission. (7) It is provided further in Section 26 that the above apportionment shall apply to two-thirds of the road fund; and then we have for the first

time in the law any mention of "higher-type roads," and it appears in the following proviso: "Provided further, that not to exceed one-third of all such funds as they become available may be used in the construction of approximately 1,500 miles of higher-type roads connecting the principal population centers, which roads shall be designated before any apportionment herein provided for is made: Provided, however, that for the construction of such higher-type roads, not to exceed $6,000 per mile thereof shall be taken from the said remaining two-thirds of such available funds." This language would indicate that the Legislature intended for the Highway Commission to select approximately 1,500 miles of higher-type roads out of the "designated system," and that the county or counties which were fortunate enough to have one or both of its roads designated as of the higher type must contribute out of the two-thirds part, $6,000 per mile in the construction of that road, and, therefore, it was intended that the higher-type roads be built over the route upon which this $6,000 apportionment would have been spent in each county. (8) By the last sentence of Section 26 it seems to be indicated that the Legislature did not intend for the Commission to change arbitrarily an entire designation, because this provides for a contingency where a state highway "designated by this act" is located on a county boundary line, each county must be charged up for one-half the cost of such construction. (9) Section 29 very largely gives rise to the dispute and controversy in this case. In the preceding sections are seen continual reference to the "designated state road system;" and in the very threshold of Section 29 there is proclaimed in no uncertain language that the Legislature intended to and did lay out and designate a state-wide connected road system. But it will be observed that it is done by describing and designating certain routes in each county, and not from one point in the State to another far-distant point in some other part of the State. Note the very first sentence in Section 29: "There is hereby created and established a

state-wide connected system of hard-surfaced public roads extending into each county of the State, which shall be located, acquired, constructed, reconstructed and improved and ever after maintained as public roads. . . . Such state-wide connected system of hard-surfaced road shall be known as the 'State Highway System' and shall consist of highways along the following described routes.'' Then follows a specific and certain description of at least two state roads in each county of the State. It will also be observed that with one or two exceptions, both designated roads in each county pass through the county seat town of every county in the State. Having created a highway system and explicitly designated the routes that were to be traversed in building it, it is not conceivable that the Legislature, by an equivocal, ambiguous phrase, intended to give the Highway Commission authority to wipe out 1,500 miles of that system by changing the designations it had made, or power to take away from the communities named in the act the roads which the Legislature in the preceding paragraphs of Section 29 had given them; but that is the construction placed upon the proviso at the end of Section 29 by the State Highway Commission. Immediately following this proviso, is Section 30, wherein it is provided that the highway engineer shall survey the ''State Highway System as designated in the foregoing section of this act, and to prepare detailed plans and specifications for each part thereof as soon as practicable.'' Thus indicating that he is to make a survey of the routes as designated by the Legislature and not otherwise. Furthermore, Section 36 makes provision for the construction of state roads ''through'' municipalities having a population of less than 2,500, and a definite part or portion of a municipality having a population of over 2,500 shall be traversed by the state road, thus indicating that the Legislature intended and supposed these roads to be constructed ''through'' municipalities and not that ''municipalities'' would be religiously avoided. (10) From a consideration of the various sections and

provisions of the road law above set out, it seems clear that the Legislature by the Act of 1921 did not authorize the Commission, in building a higher-type road, to abandon all the routes described and fixed by the Legislature, and establish a new route between two chosen termini. At most it simply authorized the Commission to designate a certain route among those described and established by the Legislature, with authority to make changes in such route in the interest of economy and directness, but at all times connecting the principal population centers of the State.

*Robert W. Otto*, Attorney-General, and *L. Newton Wylder*, Attorney for State Highway Commission, for respondent; *E. R. Morrison* and *L. C. Lozier* of counsel.

(1) The proviso incorporated in a statute restricts all preceding portions and may be in itself a grant of power. State ex rel. v. Imel, 280 Mo. 554; Supply Co. v. Smith, 182 Mo. App. 212; 36 Cyc. 1161; Ragan v. County Court, 226 Mo. 79; State v. Mooneyham, 217 Mo. App. 573. (2) A discretion is vested in the commission which cannot be controlled by the courts. Rockhill v. Benson, 97 Ore. 176; Sharp v. Kurth, 245 S. W. 636; Cook v. Hocht, 64 Mo. App. 273; Leaksville Cotton Mills v. Board of Commissioners, 184 N. C. 227; Pruitt v. King, 114 S. C. 525; Blundon v. Board of Commissioners, 93 Md. 355; Davis v. Howell, 84 Ark. 29; Board of Permanent Road Commissioners v. Johnson, 165 N. C. 632; Sample v. Carroll, 132 Ind. 496; Gaines v. Thompson, 74 U. S. 347; Kearney v. Laird, 164 Mo. App. 406; Kerr on Injunctions (2 Amer. Ed.) p. 4; High on Injunctions (4 Ed.) sec. 1326; City of Manhattan v. Hessin, 81 Kan. 153; Western Union v. Mayor of New York, 38 Fed. 553; Grayson County v. Harrell, 202 S. W. 163; State ex rel. v. Johnson, 138 Mo. App. 306. The proviso would be meaningless unless it gave an added discretion. Vineyard v. Roane County Court, 114 S. E. 380; People ex rel. v. Reel, 141 N. Y. Supp. 980; Mitchell v. Board of Commis-

sioners Chaves County, 21 N. M. 95. (3) To uphold contention of appellants would prevent participation in Federal aid. (4) Plaintiffs are not the proper parties to bring this suit. Overbeck & Shaw v. Galloway, 10 Mo. 230; 22 Cyc. 760; 22 Cyc. 912; Sec. 696, R. S. 1919; State v. Zacritz, 166 Mo. 307; Sutton v. Buye, 136 La. 234; Givens v. McIlroy, 79 Mo. 671; Kinely v. Railroad, 69 Mo. 658; Fairchild v. St. Louis, 97 Mo. 85; Rude v. St. Louis, 93 Mo. 408; Mechem on Public Officers, sec. 600; Peeples v. Byrd, 25 S. E. 677; City of Chicago v. Union Building Association, 102 Ill. 379; Sherman v. Bellows, 24 Ore. 553. (5) The Legislature expressly refused to include the Boonslick road. State ex rel. v. Gordon, 236 Mo. 142, 160; Ex parte Helton, 117 Mo. App. 609.

ATWOOD, J.—On February 9, 1923, plaintiffs (appellants here) filed in the Circuit Court of Cole County a petition for injunction against the State Highway Commission of Missouri, alleging that plaintiffs "are all resident citizens and assessed taxpayers of the counties of St. Charles and Warren and of the State of Missouri" and "that they bring and prosecute this suit for and on behalf of themselves and for and on behalf of all other resident citizens and assessed taxpayers of the State of Missouri similarly situated and interested as such in the cause of action hereafter set out." No temporary restraining order was asked and the case went off on defendant's demurrer to the petition. The additional facts properly pleaded in the petition are in substance as follows:

That defendant is the State Highway Commission of Missouri, which was organized and exists under and in pursuance of the Act of the General Assembly of August 4, 1921 (Laws 1921, 1st Ex. Sess., pp. 131 to 167), wherein its duties and powers are defined.

That in and by Section 29 of said act, the General Assembly created and established a state-wide connected system of hard-surfaced roads extending into each county of the State, which roads were located by definite de-

scription, to be known as the "State Highway System," and which were to be constructed, improved and maintained as state highways by defendant, State Highway Commission, under and in pursuance of the provisions of said act of the General Assembly.

That the roads created and established by said act as the State Highway System were opened, established, travelled public roads, which lead from county seat to county seat and principal towns of the several counties, connecting them by the state-wide connected system of hard-surfaced public roads, created and established in said act.

That as a part of the state-wide connected system, the act followed and described what is known as the "Boonslick Road," running from west to east across the counties of Howard, Boone, Callaway, Montgomery, Warren and St. Charles; the petition describing the routes (from west to east) across those counties respectively, as they are located and described in the act, naming the cities and towns through which the routes pass.

That no other routes are located and described in the act extending from west to east across these counties except the ones described in the petition, which are made a part of the State Highway System by the act.

That the State Highway Commission under the provisions of the act is authorized to select or designate approximately fifteen hundred miles of the routes created and established by the act as the "State Highway System," to be improved as roads of the "higher type" and to improve the same as roads of the "higher type," and is only authorized to improve as roads of the "higher type" such part or portion of the "State Highway System" described in the act as it shall select for that purpose.

That the Highway Commission, in the exercise of its legitimate authority, did decide to improve as roads of the "higher type" routes leading eastwardly from Kansas City in and across the counties of Jackson, Lafayette, Saline, Cooper, Howard, Boone, Callaway,

Montgomery, Warren and St. Charles to the city of St. Charles, and in so doing selected for that purpose the routes running from west to east across the counties of Howard, Boone, Callaway, Montgomery, Warren and St. Charles, as the same are located by definite description in the act of the General Assembly forming what is commonly known as the "Boonslick Road."

That having designated or selected these routes for the purpose of improving them as roads of the "higher type," it became the duty of the Commission to cause to be improved as roads of the "higher type" the routes leading from Rocheport eastwardly through Columbia, Millersburg, Fulton, Calwood, Williamsburg, Mineola, High Hill, Jonesburg and Warrenton to St. Charles.

That instead of so performing its duty under the law, the State Highway Commission, in violation of its duty and in disregard of the provisions of the act of the General Assembly in question, caused to be surveyed a route for a road beginning at a point in Howard County a short distance north of Boonville and running thence eastwardly across the counties of Howard, Boone, Callaway, Montgomery, Warren and St. Charles, which said route, with the exception of a short stretch of ten miles from Danville to a point near High Hill, in Montgomery County, is located from one to ten miles north of the routes described and located in said act as a part of the State Highway System, and runs to and touches none of the cities and towns that are reached by the routes established by the act. That the route so surveyed by the Commission follows no routes created and established by the act as a part of the State Highway System, and in large measure follows no established road at all, but runs over routes on which the right of way will have to be secured by gift, purchase or condemnation, the right of way to a larger portion of said route not having yet been secured.

That in disregard of its duty and in violation of law the Commission is about to cause to be constructed a road of the "higher type" on and along the new route

so caused to be surveyed by it and is about to expend unlawfully for that purpose the sum of five million dollars or more of public money collected or about to be collected by taxation; said public money having been set apart by said act of the General Assembly for the sole purpose of constructing, re-constructing and improving a state-wide system of hard-surfaced roads, and none others, in each county in the State, to be known as the State Highway System, as the same is created and established and located by definite description by and in said act of the General Assembly.

That plaintiffs have no adequate remedy at law and if defendant is not restrained plaintiffs will suffer irreparable injury.

That if the Commission is not restrained by a decree of court it will thus unlawfully spend more than five million dollars of public money.

That plaintiffs for themselves and all taxpayers in the State pray for an injunction to restrain defendant from unlawfully expending the taxpayers' money.

While other issues are raised by the demurrer and must be discussed to some extent, the vital question is to arrive at a correct construction or interpretation of the Act of the General Assembly of August 4, 1921, as it relates to the powers of the State Highway Commission to locate the roads of the "higher type" mentioned in the act.

I.  Appellants assign error in the action of the trial court sustaining defendant's demurrer to the petition. The first ground of demurrer is that plaintiffs have no capacity to sue. On this point the petition alleges that plaintiffs are all resident citizens and assessed taxpayers of the counties of St. Charles and Warren, and of the State of Missouri, and that they bring this suit on behalf of themselves and all other resident citizens and assessed taxpayers of the State of Missouri similarly situated and interested as such in the cause of action therein set out.

Capacity to Sue: Taxpayers.

The right of a resident taxpayer, for himself and all others similarly situated, to apply for injunctive relief against threatened injury by increase in the burden of taxation, and injury peculiar to taxpayers and not suffered by the entire public, through illegal acts of municipal officers has been recognized in this State ever since Newmeyer v. Railroad Co., 52 Mo. 81, wherein at page 89 this court said:

"The injury charged as the result of the acts complained of is a private injury in which the taxpayers of the County of Macon are the individual sufferers, rather than the public. The people out of the county bear no part of the burden; nor do the people within the county, except the taxpayers, bear any part of it. It is therefore an injury peculiar to one class of persons, namely the taxpayers of the County of Macon."

The amenability of executive and administrative officers of the State to the restrictive power of the courts in a proceeding of this kind, where special injury through increase in burden of taxation is shown, has been declared in a number of cases. [Carson v. Sullivan, 284 Mo. 353, 361; Stocke v. Edwards, 295 Mo. 402, 413.] The petition before us contains allegations of fact that defendant is about to cause to be constructed a road without authority of law and contrary to statute, and will unlawfully appropriate and expend thereon large sums of money, raised and to be raised by taxation, which have been provided, designated and set apart for the one purpose of constructing other and different roads, to the irreparable injury of plaintiffs, and that they have no adequate remedy at law. Respondent says that the petition does not show that plaintiffs' taxes have or will be increased by the acts of which they complain, or that they will suffer peculiar damage. The petition does not disclose the character or extent of plaintiffs' property, where situated or how specially affected by defendant's alleged unlawful acts, unless it be through an increase in the burden of taxation. The allegation that plaintiffs are resident taxpayers, suing for themselves and all other

persons similarly situated is, however, a precursor of other alleged facts evidently intended to show that they will suffer special injury in this way, and to support the general allegation of irreparable injury. The act of the General Assembly establishing certain highways and creating a state-wide connected system of hard-surfaced public roads extending into each county of the State, to be located, acquired, constructed and improved and ever after maintained as public roads by the State of Missouri, is pleaded. If plaintiffs are resident taxpaying citizens, the cost of constructing highways authorized by law will be paid not by the entire public, but by the taxpaying class of which plaintiffs are members and which they here represent. If funds raised by taxation and expressly set apart by law for the construction of certain highways designated by statute are expended upon other and different highways not authorized by law, as plaintiffs specifically plead, the necessary conclusion from the facts pleaded is that the burden of taxation on resident taxpaying citizens will be increased. The roads lawfully designated will have to be constructed and maintained out of additional funds raised to replace money unlawfully diverted. Failure to allege the ultimate fact that plaintiffs' taxes will be increased, when this conclusion necessarily arises from facts sufficiently pleaded, is not material. Nor is it of any importance here that the petition does not disclose that plaintiffs are the owners of automobiles. In Black's Law Dictionary a taxpayer is defined as "a person chargeable with a tax." In State ex rel. Sutton v. Fasse, 71 S. W. (Mo.) 745, GOODE, J., speaking for the St. Louis Court of Appeals, defines a taxpayer as "a person owning property in the State subject to taxation and on which he regularly pays taxes." This definition is adopted in Pope's Legal Definitions. Furthermore, even as to the sixty-million-dollar road-bond issue, Section 44-a of Article IV of the Constitution provides that "said bonds and the interest that will accrue thereon shall be paid out of a fund to be provided by the levy and collection of a direct annual tax upon all

taxable property in the State." It appears from the petition, therefore, that plaintiffs have a special interest in the subject-matter of this suit distinct from the general public and have capacity to sue, and we so hold. We also hold that there is no defect of parties, plaintiff or defendant, thus disposing of the second and third grounds of demurrer.

II. The fourth ground of the demurrer is that the petition does not state facts sufficient to constitute a cause of action. In the light of the contentions here made

**Power of Commission.**
determination of this ground hinges upon the meaning of Section 29 of the road law enacted by the General Assembly, August 4, 1921 found on pages 131 to 167, both inclusive, of Laws 1921 (1st Extra Sess.), and particularly the last ten lines thereof, at page 164, which read as follows:

"Provided, that the Highway Commission is authorized and empowered to designate the routes and types of the higher-type roads of approximately 1500 miles connecting the principal population centers of the State, and to make such changes in the routes of said roads as it may deem necessary in the interest of economy and directness of routes, and is authorized to commence the construction of said higher-type roads at such place or places on such routes as it may deem advisable; Provided further, that no changes in designation shall increase the total mileage of the State Highway System."

Immediately preceding the above lines is a nineteen-page description of the routes of the highways comprising the "State Highway System." These routes are described by naming certain lines, points, and towns in each county through which they shall pass. Plaintiffs plead the east-and-west route through the counties of Howard, Boone, Callaway, Montgomery, Warren and St. Charles, alleging that said route is commonly known as the "Boonslick Road," though it is not so named in the statute. Plaintiffs further allege that defendant designated this route as the route of the higher-type road

connecting the cities of Kansas City and St. Louis, and that in constructing said road defendant will make such changes in the route that it will miss certain towns and points through which the statute provided said route should pass, and that such changes are illegal and contrary to law. Appellants' position with reference to changes the Highway Commission is authorized to make in the routes it may designate for the 1500 miles of higher-type roads is thus briefly stated on pages 9 and 10 of their reply brief:

"While the Highway Commission is authorized to make changes in the location of routes, in the interest of economy and directness of routes, that power is limited to making such changes between the cities and towns on the routes established in the act, and it. has no authority so to change the routes as to leave any of those cities and towns off of the improved road."

Respondent claims that it has such power and is acting according to law and within the scope of its lawful discretion. These contentions call for an interpretation of the clause in Section 29 immediately following the first use of the word "provided" in the lines above quoted. The meaning of other portions of the act is apparently not questioned in this proceeding.

It is a cardinal rule in the construction of statutes that effect is to be given, if possible, to every word, clause, and sentence. [38 Cyc. 1128; State ex rel. v. Harter, 188 Mo. l. c. 529; Strottman v. Railroad, 211 Mo. l. c. 251.] The first paragraph of Section 29 is as follows:

"There is hereby created and established a state-wide connected system of hard-surfaced public roads extending into each county of the State, which shall be located, acquired, constructed, reconstructed, and improved and ever after maintained as public roads, and the necessary grading, hard surfacing, bridges and culverts therefor shall be constructed by the State of Missouri. Such state-wide connected system of hard-surfaced roads shall be known as the 'State Highway System,' and shall consist of highways along the following described

routes:" (Here follows the above mentioned nineteen-page description of routes naming by counties the towns, lines and points through which the routes shall pass).

Section 30 directs the engineer to cause surveys to be made of the "State Highway System" as designated in Section 29, and makes it his duty, "when practicable," to adopt and utilize previous surveys together with plans and specifications if any have been made by the highway department. It is plain that the General Assembly never intended that these previous surveys should determine the location of the routes comprising the State Highway System. A discretion was vested in the Commission as to the adoption of such surveys and the exercise of such discretion will not be interfered with in this proceeding. The only thing done toward the location of the routes comprising the State Highway System was to name certain towns, lines and points in each county through which they should pass. It clearly follows that the location of the routes of the entire highway system between these named towns, lines and points was, under that portion of Section 29 which preceded the proviso now under consideration, left to the sound discretion of the Highway Commission. Therefore, appellants' above interpretation that in the location of the 1500 miles of higher-type roads the Highway Commission can change the routes only between towns, cannot stand because it ascribes no meaning to the proviso, this power under the preceding enactment being already in the Commission as to all routes comprising the State Highway System. The proviso is not expressly or impliedly a restriction on the powers of the Commission, nor can it be tortured into such even by the much used and frequently abused maxim, *expressio unius exclusio alterius est.* The Highway Commission's power "to make such changes in the routes of said roads as it may deem necessary in the interest of economy and directness of routes" is general. This power is not expressly affirmed as to the one matter of changing routes between towns.

Where there is no *expressio unius* there can be no *exclusio alterius,* and hence no application of the maxim.

On page 15 of the brief of *amicus curiae* the following interpretation of this clause or proviso is suggested:

"It authorizes the Commission to use its discretion in the selection or designation of certain legislative-designated routes to be constructed as a higher-type road, and after having designated some particular legislative route, then the Commission may make such changes 'in' that route, provided the changes are made in the interest of economy and directness, and do not increase the total mileage of the State Highway System; but in making any change in that route they cannot miss legislative designated points in any one of the counties through which that route may pass."

This position is likewise untenable, and for the same reason that it would give the proviso no meaning. We cannot assume that this clause is but the vain repetition of a power already lodged in the Commission. If possible this language must be given some force and effect. The trouble with the interpretations suggested by appellants and the *amicus curiae* is that they violate a cardinal principle of statutory construction, namely, that all parts of the statute must, if possible, be given meaning and effect. [State ex rel. v. Harter, supra; Reagan v. County Court, 226 Mo. l. c. 89.] In order to carry his point one may not cull out parts of the statute inconsistent with his view and treat them as surplusage or idle repetition, as appellants in effect here seek to do. The real question is whether this clause as well as other parts of the statute can be given force and effect and at the same time carry out the evident legislative intent of the act taken as a whole.

In dealing with this question appellants persist in the erroneous view that a proviso may not confer power as well as impose restrictions. In 36 Cyc. 1161, it is said:

"A proviso is a clause engrafted on a preceding enactment for the purpose of restraining or modifying the

enacting clause, or of excepting something from its operation which otherwise would have been within it, or of excluding some possible ground of misinterpretation of it, as by extending it to cases not intended by the Legislature to be brought within its purview. The appropriate office of the proviso is to restrain or modify the enacting clause, and not to enlarge it, but where from the language employed it is apparent that the Legislature intended a more comprehensive meaning, it must be construed to enlarge the scope of the act, or to assume the function of an independent enactment.''

The American & English Encyclopedia of Law (1 Ed.) vol. 23, page 435, thus tersely defines the office of provisos: ''A proviso is something engrafted upon an enactment, and is used for the purpose of taking special cases out of the general act and providing specially for them.''

Brown v. Patterson, 224 Mo. 639, 658, quotes with approval People ex rel. v. Kelly, 5 Abbott's New Cases, l. c. 405, in which the New York Court of Appeals adopts this definition of the term proviso: ''A proviso in a grant or enactment is something taken back from the power first declared. The grant or enactment is to read, not as if the larger power was ever given, but as if no more was ever given than is contained within the terms or bonds of the proviso.''

Construing a statute defining a certain duty of the county court, GRAVES, J., speaking for this court in Reagan v. County Court, 226 Mo. l. c. 89, said: ''The terms of the proviso limit the general terms of the broad act, and it can make no difference as to the force and effect of a proviso, whether its purpose is to limit the terms of a statute which grants rights, or whether it limits the powers of a statute which restricts rights. It is argued in this case that the first provision of this statute restricts the rights of the county court, but granting that to be true, the proviso, which is the later legislative expression, removes some of the restrictions.''

The portion of the title of the act relevant to the section under consideration (Laws 1921, 1st Ex. Sess. p. 132) reads: ''Providing for the construction and maintenance of a state-wide connected system of hard-surfaced public highways extending into each county of the State, to be known as state highways; authorizing and directing the State Highway Commission to designate the routes along which such highways shall be constructed.'' This language and the enacting words of the first paragraph heretofore quoted from Section 29 creating and establishing the State Highway System of hard-surfaced roads and describing routes in and through different counties, all of which precede the proviso, clearly indicate a restriction or limitation of the Commission's power to change routes to those portions between the named towns, lines and points. The reiteration of this limitation in a subsequent proviso would be to no purpose, but if the General Assembly in the location of the 1500 miles of higher-type roads desired to modify this restriction and vest a discretion in the Highway Commission ''to make such changes in the routes of said roads as it may deem necessary in the interest of economy and directness of routes,'' the natural and reasonable way to carry out such legislative intent was to enact this clause. It is an approved course in legislation and the language of the proviso is apt and effectual to accomplish this end. As the first provision of Section 29 in effect limits or restricts the rights of the Highway Commission in laying out the routes, so the proviso, which is the later legislative expression, modifies the restriction and consequently enlarges the power of the Commission. [Reagan v. County Court, supra.] It is no valid objection that the proviso conflicts in part with the enactment which precedes it. Such is the very purpose and function of a proviso, and when the restriction laid in the main part of the act is lifted by the proviso the whole act must be read as though the restriction never existed as to the matter covered by the proviso. [Brown v. Patterson, supra.] Although under this proviso the High-

way Commission has a larger discretion than that sanctioned by the preceding terms of Section 29, yet the legislative intent to vest such discretion so plainly appears from the language employed that it cannot be denied, and the subsequent proviso "that no changes in designation shall increase the total mileage of the State Highway System" clearly keeps the clause within the general scope and purpose of the act. Respondent, therefore, has the power it claims, even though this clause be strictly construed as a proviso in the usual legal acceptation of that term.

However, use of the word "provided" does not in and of itself convert the words following into a "proviso" in the strict legal sense. The word may be used in the conjunctive sense and precede an independent out-and-out grant of power. In Georgia Banking Co. v. Smith, 128 U. S. 174, at page 181, it is said: "The general purpose of a proviso, as is well known, is to except the clause covered by it from the general provisions of a statute, or from some provisions of it, or to qualify the operation of the statute in some particular. But it is often used in other senses. It is a common practice in legislative proceedings, on the consideration of bills, for parties desirous of securing amendments to them to precede their proposed amendments with the term 'provided,' so as to declare that, notwithstanding existing provisions, the one thus expressed is to prevail, thus having no greater signification than would be attached to the conjunction 'but' or 'and' in the same place, and simply serving to separate or distinguish the different paragraphs or sentences."

The same rule is stated in State ex rel. v. Moneyham, 212 Mo. App. 573, and there is much in the legislative history of the act pointing to such use of the word in this case. But it is immaterial whether used in the strict legal sense of introducing a limiting proviso, or in the popular legislative sense of a conjunctive, for the result is the same. Power to make such changes as it may deem necessary in the interest of economy and directness in the

routes designated for the higher-type roads of approximately fifteen hundred miles connecting the principal population center of the State was thereby vested in the State Highway Commission.

It may be here suggested that the statute does not name or define "the principal population centers of the State." The Highway Commission is thus left to determine the population centers it will connect with roads of the higher type, but it can construct only fifteen hundred miles of roads of this type. Consequently many population centers of the State cannot be connected with the "higher-type" roads. But the General Assembly doubtless intended that by economy and directness of routes the Commission should make these fifteen hundred miles of higher-type roads go as far as possible and connect as many of the population centers of the State as possible in the order of their extent and importance. This determination calls for the exercise of a sound discretion both in the choice of the population centers to be connected and in the location of higher-type roads connecting them, which discretion is here plainly vested in the Highway Commission. It is not pretended that all the towns named by statute as points through which roads comprising the State Highway System should pass are principal population centers of the State, or that the fifteen hundred miles of higher-type roads can by any stretch of money or imagination be made to pass through all of them. With just as little reason may it be claimed that the principal population centers of the State can be connected by fifteen hundred miles of higher-type roads' without missing some of the towns named in the routes designated by statute. If appellants' contention were upheld it would not only do violence to the above plain language of the statute, but it is also apparent from the road law and facts connected with the administration thereof of which we can but take judicial notice that the most expensive and far-reaching part of our road construction would be frittered away on extravagant indirect routes and principal population centers of undoubted

rank would be deprived of the connection to which they would be entitled under the law as declared in the last controlling expression of the legislative intent. Furthermore, Section 21 gives the Commission power to purchase or condemn right of way, thus indicating that the General Assembly did not intend that the location of routes should be confined to roads already opened. Also, Section 26 provides that the fifteen hundred miles of higher-type roads be designated before any apportionment of highway funds is made to the counties, thus recognizing that the actual location of the higher-type roads would affect the mileage of the State Highway System previously designated in each county. These and other provisions of the act argue strongly that the General Assembly purposed by this proviso to lodge a discretion in the Highway Commission, untrammeled by any previous enactment, to make such changes as it might deem necessary in the interest of economy and directness of routes in the routes it might designate for the higher-type roads, and we hold that such discretion is well vested. Respondent's exercise of this discretion will not be interfered with in this proceeding, and appellants do not contend that this should be done if the discretion exists.

In support of their contention appellants cite cases construing the Illinois road law, but this statute expressly limits the Commission's power to change routes to the making of *minor* changes, and it is in other respects so materially different from our own law that the decisions are of little assistance here. Cases are also cited from other jurisdictions and other arguments are advanced. We have carefully examined each and all of them but find no cause to modify our views above set out. Plaintiffs' petition fails to state facts sufficient to constitute a cause of action and there is no equity in the bill.

The judgment of the trial court is affirmed. *Blair, C. J.,* concurs; *Ragland* and *White, JJ.,* concur in separate opinions; *Graves, J.,* dissents in separate opinion; *Walker, J.,* dissents in separate opinion and concurs with *Graves, J.; Otto, J.,* not sitting.

RAGLAND, J. (concurring).—It seems to be clear that the dominant purpose of the statute is to create an inter-county system of connected hard-surfaced public roads co-extensive with the State, and that its secondary purpose, which regards the State as a whole, is to connect the principal centers of population by higher types of roads than can be constructed generally with the available funds, so far as it can be done with 1500 miles of road. It does not of course contemplate two highway systems, but one with two objectives.

In creating "a state-wide connected system of hard-surfaced roads," the statute places the emphasis on the county, makes it the unit of the system. It takes up the counties one at a time, in alphabetical order, and specifically describes and marks out the routes therein along which roads "shall be located, acquired, constructed, reconstructed and improved." When the routes so marked out in the several counties are visualized as a whole they form a connected system, and this the statute constitutes the "State Highway System."

Having created the State Highway System from the routes specifically laid out in the several counties, the statute next empowers the Highway Commission to designate such of those routes as are to be used for the construction of the higher-type roads and after so selecting them to make such changes in them as it may deem necessary "in the interest of economy and directness of routes." The extent to which changes may be made in the routes selected for higher-type roads is the subject of contention, appellants insisting that the Commission's power is limited in that respect to making changes *between the points* designated by the statute in laying out the routes, and respondent contending that no such limitation is imposed. That was the sharply defined issue presented on the hearing, and is the only one touching the Commission's power with respect to making changes in routes dealt with by the principal opinion, in which I concur. However, the argument was strenuously pressed by the appellants that a holding that the Commission

could vary the routes selected for the higher-type roads from the specific points designated by the Legislature in laying them out would in effect be that the Commission has the unrestrained power, if it desires to exercise it, of building the higher-type roads on air lines between larger cities of the State, wholly ignoring statutory routes. But the premises do not warrant the conclusion. The power given to make changes is limited not only by the express language, "in the interest of economy and directness of routes," but by the implication of the statute as a whole, which clearly discloses its dominant purpose, namely, to provide local and inter-county communication by means of state-maintained hard-surfaced public roads. The specific right to participate in such use of hard-surfaced roads is conferred by the statute upon the people of every county in the State, the extent of that right as respects any one county being measured by the location and mileage of the roads which the statute prescribes for that county. And any change of routes which operates to substantially abridge or impair the right so conferred is beyond the power of the Commission. The change which is the subject of this controversy does not, in my opinion, effect such an abridgment or impairment.

To what is said in the principal opinion in exposition of the statute I desire to add some observations which I think are pertinent.

The State Highway System was not made up of public roads existing at the time of the passage of the act. Note the language of Section 29: "There is hereby created and established a state-wide connected system of hard-surfaced public roads, . . . which *shall be located, acquired, constructed, reconstructed and improved . . . along the following described routes.*" In the description of the routes by counties which immediately follows there is not a single reference to an existing public road or survey. Nor does the next section (Section 30) refer to surveys previously made as descriptive of the routes; it merely provides that such surveys

312 Mo. Sup.—18.

shall be utilized whenever practicable. The only means given for ascertaining the routes intended are named points and general directions, and the general directions are merely incidental, performing no other function than that of identifying the points designated. Take for example the east-and-west route across Callaway County as described by the statute: ''Beginning at the Callaway-Boone county-line near Millersburg, thence south and east through Millersburg to Fulton, thence north and east through Calwood to Williamsburg to the Callaway-Montgomery county-line.'' The route is definitely fixed only as to the points named. Any conceivable line drawn from a point on the Callaway-Boone county-line near Millersburg south and east through Millersburg to Fulton, thence north and east through Calwood to Williamsburg to the Callaway-Montgomery county-line would fall within the statutory description. It is apparent therefore that the only possible way in which a *change* can be effected in the route *as prescribed by the statute* is to vary it from one or more of the points named. If the proviso at the close of Section 29 does not contemplate that, it is entirely meaningless. The statute in not designating the courses and distances to be run in connecting up the points named on the several routes left the determination of the routes in *that respect* to the unfettered judgment of the Commission or its engineer. And when routes are marked out following the general directions indicated and connecting the points named in the statute, the Commission or its engineer adopting such courses and distances in surveying them as it or he deems proper, they, regardless of their departures from existing roads and surveys, are the *statutory* routes, and not *changes* in such routes.

It does not seem to me that the proviso just referred to is called upon to perform any unusual function in order that it may aid in making the legislative intent manifest. Read Section 29 as a whole, including the proviso: It first declares that the State Highway System ''shall consist of highways along the following described

routes;'' it then specifically describes the routes; and immediately following the descriptions of the routes it provides that such of them as may thereafter be designated for the construction of higher-type roads may be changed. In other words, the routes of all the roads constituting the State Highway System are definitely fixed, with the exception of those which the Commission may select for the construction of higher-type roads; those may be changed.

WHITE, J. (concurring).—A definition of the office of a proviso to a legislative act is usually an attempt to state a general principle to which the ruling in the particular case may be referred. Manifestly, a proviso must be what the term implies—a condition, or a modification of what has gone before. If it made no change in the operative effect of the terms to which it is attached, it would perform no office, and would be mere surplusage. Its office is not limited to mere restriction upon power granted; it may relax a restriction. It may modify a negative enactment so as to release some restraint, as well as it may modify an affirmative grant by additional restraints. In other words, it may draw in the lines of enclosure, or it may add new panels to the barriers and expand the enclosed limits.

The proviso in this case operates upon an act which defines and limits the scope of its operation. If the proviso does not enlarge those limits it has no effect. The Legislature had already exercised its authority in designating routes in the highway system. Unless the proviso authorized a modification of that designation it would perform no office at all. It would have no meaning. The first selection of routes was comprehensive and in some particulars indefinite. It will not do to say that the purpose of the proviso is to permit only changes of the routes between the points designated in Section 29. That would be no change, because no routes are fixed between designated points, and no points are fixed where county lines are crossed.

Section 29 creates a "state-wide connected system of hard-surface public roads . . . which shall be *located, acquired,* constructed," etc. If such roads are to be "located" and "acquired," then the commission, if any one, is empowered to "locate" and "acquire" them between designated points. That is not only implied, but expressed, in the terms of Section 4, by which the Commission is vested with *"all powers necessary or proper* to enable the Commission . . . . *to carry out fully and effectively all the purposes of this act."*

In carrying out the purposes of the act, the Commission must "locate" the roads, for, except at certain designated points, they are not located, even at the county lines. That is an original duty. It involves no *change* of lines or points and the word "change" used in the proviso, cannot apply to the discharge of that duty.

Thus the authority to locate the routes between designated points being already in the Commission, what was the purpose of the proviso? It authorizes the Highway Commission *"to designate the routes and types of higher-type roads."* Does that mean, as appellant contends, merely that the Commission must select the higher-type roads from the routes already designated? Concede that to be true, and that the Commission in designating higher-type roads must follow the general inter-county plan. Then, further, the Commission may "make such *changes in the routes of said roads as it may deem necessary* in the interest of economy and direction of routes." Does "said roads" as used in that connection mean merely the higher-type roads? Concede that contention. Thus, after empowering the Commission to "designate" the higher-type roads, the Legislature follows that up by giving it authority to *make changes,* evidently with a view to adapting routes designated to the purposes of the higher-type roads. That is, the Commission may designate the higher-type routes, and in doing so may change designated routes, where, "in the interest of economy and directness of route," it is necessary. Any

change whatever necessarily would be a change from designated points. Otherwise, nothing would be changed.

That would not be a duplication of lines so as to in crease the total mileage. To change a route does not make two routes; it remains only one.

We must give effect to the proviso if possible. We have no authority to amend a legislative act or to make it inoperative by construction. It is not our office to pass upon the propriety or expediency of the act. If the proviso means anything, whether we deem it wise or not, we must say so. Unless we interpret it to have the effect which the majority opinion gives it, it has no meaning. We cannot assume that the law-makers were deceived by an incomprehensible joker, nor question their wisdom in granting to the Commission the powers mentioned.

For these reasons I concur in the majority opinion.

GRAVES, J. (dissenting).—I cannot concur in the majority opinion written by my learned associate, nor in the result of a concurring opinion, written by another of our learned associates.

We are not so much concerned, in this case, with the general effect of a "proviso" to a statute, because that is firmly fixed in our case law. Thus in Brown v. Patterson, 224 Mo. l. c. 658 (after a full consideration of many cases and texts) we said:

"The purpose of a proviso is not to create new rights or make new law or to take away old rights existing under the law or to repeal a part of existing substantive law, but to restrict or restrain the preceding portion of the statute of which it forms a part."

So also in Reagan v. County Court, 226 Mo. l. c. 89, we further said:

"A fundamental rule of construction is that the whole act, including the proviso, must be construed so as to give force and effect to the act as a whole, not overlooking, however, the purpose of a proviso. This purpose has well been defined by the New York court, as men-

tioned in the Brown case, supra, thus: 'A proviso in a grant or enactment is something taken back from the power just declared. The grant or enactment is to read, not as if the larger power was ever given, but as if no more was ever given than is contained within the terms or bonds of the proviso.'

"The terms of the proviso limit the general terms of the broad act and it can make no difference as to the force and effect of a proviso, whether its purpose is to limit the terms of a statute which grants rights, or whether it limits the powers of a statute which restricts rights."

The first proviso in Section 29 of the State Roads Act (Laws 1921, Ex. Sess., pp. 126 to 169, both inclusive) was the stroke of a master mind. Such mind may have been in the Legislature, but more likely not. It was no doubt intended for the joker to the bill, and it largely remains for the court to determine whether this master mind was sufficiently acquainted with the legal effect of a proviso to a statute, to make his joker effective. No State in this Union, in the construction of its State Highway System, has left its State capital off of a higher-type hard-surfaced road, but this assumed joker in our statute has been used for that purpose, to the shame of this State and its inhabitants, and the inconvenience of inter-state travelers, who of all things desire to see a State's capital.

But the intended joker is in the law, and it is for the court to determine the meaning of the whole act including both the first proviso, as well as the second proviso. When we say the meaning of the whole act, we mean that we must try to give a construction to the whole act, considering the joker added to Section 29. This we shall try to do in the following paragraphs. That a commission has run wild, and violated the law, in the construction of hard surfaces upon roads, should have no influence in a clean-cut exposition of the law.

I. That we may have the first part of Section 29 and the provisos thereto in juxtaposition we quote those

portions first, and discuss them—not overlooking, however, that we must in determining the question look to each and every section of the whole act in arriving at the meaning of the whole act including the meaning of Section 29, as added to by the provisos.

The first part of Section 29 of the act reads:

"There is hereby *created and established a state-wide connected system of hard-surfaced public roads extending into each county of the State,* which shall be located, acquired, constructed, reconstructed, and improved and ever after maintained as public roads, and the necessary grading, hard surfacing, bridges and culverts therefor shall be constructed *by the State of Missouri. Such state-wide connected system of hard-surfaced roads shall be known as the 'State Highway System,'* and shall *consist of highways along the following described routes."* The italics are ours.

Following the foregoing quotation is an outline of the parts of this *"state-wide connected* system of hard-surfaced roads" which is, by the act, designated and called the *"State Highway System,"* and is a detailed description, by a named starting point, a named ending point, and also intermediate points (by name) of that portion of the "State Highway System" in each county of the State. These different county segments are such that they join up to the segments in other counties, and thus form the connected system. The last portion of Section 29 reads:

"Beginning at the Pettis-Morgan county-line east of Smithton, thence in an easterly direction connecting with the east-and-west road in Moniteau County north of Tipton: Provided, that the Highway Commission is authorized and empowered to designate the routes and types of the higher-type roads of approximately 1500 miles connecting the principal population centers of the State, and to make such changes in the routes of said roads as it may deem necessary in the interest of economy and directness of routes, and is authorized to commence the construction of said higher-type roads at such

place or places on such routes as it may deem advisable; Provided further, that no changes in designation shall increase the total mileage of the State Highway System.''

The powers of the Commission is found in Section 14 of the act, which reads:

''The commission shall:

''(1)   Have supervision of highways and bridges which are constructed, improved and maintained in whole or in part by the aid of state moneys, and of highways constructed in whole or in part by the aid of moneys appropriated by the United States government, so far as such supervision is consistent with the acts of Congress relating thereto.

''(2)   Prescribe rules and regulations not inconsistent with law, fixing the duties of all persons employed by the State Highway Commission.

''(3)   Provide for aiding county highway engineers or other officials of civil subdivisions in establishing gradients and alignments, and preparing suitable systems for maintenance of highways and bridges.

''(4)   Cause standard plans, specifications and estimates to be prepared for the repair and improvement of highways and the construction and repair of bridges by civil subdivisions.

''(5)   Investigate and determine upon the various methods of road and bridge construction adapted to different sections of the State and as to the best methods of construction and maintenance of highways and bridges.

''(6)   Compile statistics relating to public highways throughout the State and collect such information in regard thereto as it shall deem expedient.

''(7)   Aid at all times in promoting highway improvement throughout the State.

''(8)   Prepare plans, specifications and estimates for all State Highways.

''(9)   Let all contracts for the construction or improvement of State Highways.

"(10)   Prescribe a system of auditing and accounting for all road and bridge moneys for the use of all highway officials, which system shall be as nearly uniform as practicable.

"(11)   *Have power to construct,* under its own direction and supervision, *all roads, culverts or bridges, or any part thereof as hereinafter provided.*"

Clause 11, supra, is the only portion really applicable to the question before us, but we quote all, so that there can be no quibbling about the meaning.

The words "as hereinafter provided" clearly refer to that portion of Section 29, which by naming the points of beginning and ending, as well as the intermediate points, has by legislative action fixed the "highway system" of the State. Observe that there is no grant of power for air lines between two extreme centers of population, one on either side of the State. Up to this point, or to this section of the law, higher-type surfacing must follow the legislative named roads, because Section 14 of the act clearly refers to them, and to no others. Up to this the Commission's right and power to construct roads is limited to those words, "as hereinafter provided," and such roads are fully described in Section 29, and not elsewhere. The surfacing of roads must of necessity be confined to those roads which the Commission has the right to construct, and the only roads they were given the right to construct under Section 14, supra, were those which the lawmakers had "hog-tied" by the specific description in Section 29. It will be noticed that under Section 14, clause 11, quoted, supra, the power is given the commission to construct, but the power to construct is limited to the roads named thereafter in Section 29. Section 30 of the act in no wise changed the situation. This section reads:

"The engineer shall proceed to cause surveys to be made of the State Highway System as designated in the foregoing section of this act, and to prepare detail plans and specifications for each part thereof as soon as practicable; provided, however, that wherever surveys have

heretofore been made, it shall be the duty of the engineer, when practicable, to adopt and utilize such surveys, together with plans and specifications if any have been made by the highway department."

This section only empowers the engineer "to cause surveys to be made of the *State Highway System as designated in the foregoing section* of this act." There are no roads covered by Section 30, except those specifically *designated*. The latter portion simply gives them (the engineers) the right to adopt previous surveys, if any have been made along the designated routes. Certain it is, that Section 30 does not authorize the engineer to survey any new route or routes designated by the Commission. Their power is to survey routes *designated* in Section 29, and not routes which the Commission, or any other body, may undertake to establish in the future. Section 30, therefore, in no way assists in the construction of the provisos, because the provisos do not undertake to designate routes. This section is relied upon by my learned associate in the construction of the provisos. It can serve no such purpose. Neither does it add one iota to the general powers of the Commission under Section 14, quoted in full, supra. Nor does it add to or take from the "road system" mentioned in the first portion of Section 29, quoted, supra.

Before reaching vital questions in this case, i. e. what effect these provisos to Section 29 have upon the whole act, there are side-lights in other sections of the law. It is estimated that the specific routes named in Section 29 (county by county, but so named as to connect at county lines, and thus to form a .connected system) total 7,600 miles. This is the system created by the law-makers, excluding the provisos. The law had to follow the constitutional provision, Section 44a, Article IV, of the Constitution, as amended by the people in November, 1922. Bonds in the sum of $60,000,000 were authorized by this provision of the organic law "for the purpose of constructing *hard-surfaced* public roads, *in each county of* the State." [Laws 1921, p.

698.]   These words were in the original Section 44a of
the Constitution, previously adopted, because but a
slight change was made with reference to interest.   So
in 1921 (Extra Session) the law-makers were but fol-
lowing the organic law, when they designated a road sys-
tem, for the State, county by county, so as to make one
continuous system.

Section 26 of the act is a long section, but there is
so much in it that lends light to a reasonable construc-
tion of the act, including the provisos to Section 29, that
we quote it in full, as follows:

"The State Highway Commission may contract for
the grading, bridging, and culverting of any part of the
established system of highways separately and apart
from the surfacing thereof.   Construction shall begin as
nearly as possible and practicable at the same time in
each of the several counties, and allotment or apportion-
ment of the funds shall be made to each and every county
at the same time; and at reasonable intervals as the
funds are received and collected or as they accrue, and
the *pro rata* part or portion of such funds so appor-
tioned, allotted and set apart to be expended or refunded
in each county shall be and become immediately avail-
able and shall be expended as provided by law for con-
struction work upon the roads and highways designated
in each county for construction or improvement as state
highways or for the purpose of refunding where roads
have already been constructed.   The funds apportioned,
allotted and set apart for construction of such state
roads or for refunding purposes in each county shall be
expended only in the county for the benefit of which same
are so apportioned, allotted and set apart.   All available
funds, including Federal aid, shall be apportioned and
expended upon the State Road System as follows:   To
each county shall be apportioned an amount to be as-
certained by multiplying the total number of miles of the
state-wide system of roads in such county, as designated
herein, by $6,000:   Provided, that if this amount is in-
sufficient to complete such State Highways of the type

needed to serve the needs of said county of a minimum type of properly bound gravel road or its equivalent of at least twelve feet in surface width and built up to the standard required by the Federal Government, such additional money shall be added as shall be required to complete the construction of the State Highways and connect them with like roads of surrounding counties and states. In making the apportionment as herein set forth, the commission, after estimating the amount required to build such roads in each county, shall use such estimates as a basis of apportionment of two-thirds of such funds, but in no case shall such estimates be less than $6,000 per mile; the intention being that the commission shall make such apportionment for the several counties as shall result in the construction of roads for all counties on the basis of their proportionate mileage, irrespective of the difference in cost of construction of the said properly bound gravel roads: Provided further, that not to exceed one-third of all such funds as they become available may be used in the construction of approximately fifteen hundred miles of higher-type roads connecting the principal population centers, which roads shall be designated before any apportionment herein provided for is made; Provided, however, that for the construction of such higher-type roads, not to exceed $6,000 per mile thereof shall be taken from the said remaining two-thirds of such available funds. The Commission shall, as soon as practicable, ascertain the facts necessary therefor and open and maintain open for public inspection an account with each county in the State showing the amount of the six thousand dollar a mile allotment and any additional allotments required to be made to such county by the provisions of this act, and charge against such sum the total expenditures therefrom for each month, during the time that the construction work contemplated by this act is in progress. Where a State Highway designated by this act is located on a county boundary, one-half of the mileage of such boundary line road shall be credited to each county and each

county's fund shall be drawn upon for half the cost of construction of such boundary line road.''

Note that here we have the power given to separate the construction of the road, from the surfacing of the road. This is a significant fact to be borne in mind, as we proceed with the section. Further note that it speaks of ''the established system of highways;'' air lines from east to west, or from north to south are not found in this system. The funds are to be apportioned to the counties in proportion to mileage, and these funds were ''to be expended or refunded in each county . . . and shall be expended as provided by law for construction work upon the roads and highways *designated* . . . as State Highways or for the purpose of refunding where roads have already been constructed. The money (both State and Federal) was to be expended upon the *state-wide road system,* and no power given the Commission to establish such. If the county had already constructed the road on the line designated by the Legislature, such county was entitled to a refund, in not less than $6,000 per mile. These provisions apply to two-thirds of the funds, both State and Federal. Then we have the first proviso to Section 26 which allows out of the remaining one-third ''the construction of approximately fifteen hundred miles of higher-type roads connecting the principal population centers, which roads shall be *designated* before any apportionment herein provided for is made.'' The next proviso makes it plain as to what roads shall be *designated.* It says: ''Provided, however, that for the construction of such higher-type roads, not to exceed $6,000 per mile shall be taken from said remaining two-thirds of such available funds.'' Now when it is considered that the funds go to each county at the rate of not less than $6,000 per mile, and that the amount is to be ascertained by multiplying the total number of miles of the *state-wide system* of roads in such county, as designated herein, by $6,000, it is clear that the law-makers meant that the higher-type roads should be constructed along the roads established by the Legislature in Section 29 of

the Act of 1921, and that to secure the higher type, the Commission could use the $6,000 per.mile out of the two-thirds, and add thereto from the remaining one-third retained for the higher class surfacing of the estab-lished roads of the state-wide system.  To give this sec-tion, and other sections, the meaning urged by the Com-mission, is to add 1500 miles of road to the State-wide Highway System, which is preposterous.  The word *des-ignate* as used herein means to select from the legisla-tive-established state-wide sytem of roads, the roads to be made of a higher type.  Population centers do not mean two or three on east-and-west roads, and two or three on north-and-south roads, but it means all popu-lation centers of the State, to the end that such popula-tion centers may be accommodated with a road, and fur-ther means that if the Commission chooses to make state cross-road lines of higher type, it must follow the population centers fixed by law upon such lines.  Sec-tion 36 contemplates that these roads, whether of higher type or of lesser grade, shall pass through the smaller population centers.

Then we reach Section 37, which places ''the State Highways as *herein designated*'' under the control of the Commission, and provides for the maintenance of them.  This can only refer to the legislative-*designated* and established roads, because no air lines, or hard-surface lines of superior type had then been designated, or created and could not be designated, until later. Note further the language: ''the roads *included* in *said State Highway System.''*  There was no designated or created ''said State Highway System'' except those named in the act for the respective counties.

In the road laws of 1917 and 1919, under which many portions of the present State-wide Highway System were constructed, the law-makers had left it to the road au-thorities to lay out and select the roads.  To the very contrary was the Act of 1921.  The Legislature saw fit to lay out the State-wide Highway System in express legislative terms.  This of itself evidences a legislative

desire not only to get away from the old system, and assume the responsibility themselves, but of keeping together what already had been accomplished by the use of State and Federal money. We now go to the provisos of Section 29, upon which the majority opinion turns.

II. Going now to the provisos in Section 29 of the Act of 1921. In this discussion we must not overlook the legal effect of a proviso contained in an act. Its purpose is not to extend the act, but to limit the act and the powers granted by the act, or by way of exceptions withdraw from the preceding sections some of the things granted. Provisos create no new law, and no new powers; they only limit the broad terms of preceding portions of the section or act, and can add no new powers. [Brown v. Patterson, 224 Mo. l. c. 658, supra; Reagan v. County Court, 226 Mo. l. c. 89, supra.]

The rule of construction is to go to the whole act, including the provisos, and from it all determine the legislative intent. [Reagan v. County Court, supra.] The two provisos must be considered together. The second one limits and interprets the first one. It says: ''Provided further, that no changes in *designation*'' (not in establishment of the roads, which was done by the first parts of Section 29) ''shall increase the total mileage of the State Highway System.'' This clearly refers to the system established by the law-makers, in county by county, until all the counties had been covered. It is estimated that this system included 7600 miles of road. This second proviso shows that there was in the mind of the Legislature a State Highway System, and that it should not be increased in mileage by 1500 miles of higher-type roads. The limit of mileage was fixed by the specific mileage given to each of the 114 counties, which mileage was the State Highway System. There is no power given the Commission to abandon any designated portion of the system, and certainly none to add 1500 miles of new road to the system. With no power to abandon the respective mileage allotments to the several counties, and

no power to add to the system additional mileage, what does the first proviso mean? It was simply making clear what might otherwise have been mooted, i. e. that the Commission should have the right to hard-surface, and make of a higher-type, such portions of the established highways as it saw fit—not to abandon them altogether. If the Commission desires to make a continuous high-type road either east and west or north and south through the State, it could do so by the selection and designation of the proper established roads in the system. But in doing so they must go from town to town on the established routes, only varying therefrom between the designated towns or cities in the interest of directness of route and economical construction. Absent any authority in this first proviso, or in any other portion of the act, to abandon a single established road in the system, there is no other reasonable construction which can be given the act as a whole.

As the Commission cannot increase the mileage as specified by the law-makers, how can it abandon an established route for ten or twenty miles without having two portions of State Highway paralleling each other at a distance between them of only a few miles? To illustrate by the case pending wherein the *amicus curiae* appeared. The established route is through Fulton to Columbia on the west, and from Fulton to other municipalities on the east. The Commission is contemplating the construction of a road (without reference to the road established by the law-makers) some eight or ten miles to the north. Every inch of this unlawfully constructed road is adding to the mileage of the state-wide road system, and is beyond the lawful power of the Commission. The first road was "created and established" by law, and there is no power to take it out of the State Highway System, except by legislative act.

The trouble with my learned brother's construction is that it leaves off of a State Highway many towns which the law-makers said must be on such highway. As in the example given above, as to the road from Fulton to

Columbia, we would have two portions of state roads within a few miles of each other, or we would have the "created and established" route abandoned. If not abandoned, then we would have added to the mileage of the system two state roads. Had the construction of my learned brother been read to the Legislature before the passage of this act, there would have been no passage of it, because such construction was not then, and never has been, the legislative intent. The whole act so shows. My learned brother builds up a discretion in the Commission by virtue of Section 30, and then argues that the first proviso has been, under our construction, given no effect. This because the Commission had a discretion, without the proviso. We have discussed Section 30, supra, but at the expense of brevity, we shall go further, because this is the "king bolt" upon which the whole opinion rests. We must reproduce said section here. It reads:

"The engineer shall proceed to cause surveys to be made of the State Highway System as designated in the foregoing section of this act, and to prepare detail plans and specifications for each part thereof as soon as practicable; provided, however, that wherever surveys have heretofore been made, it shall be the duty of the engineer, when practicable, to adopt and utilize such surveys, together with plans and specifications if any have been made by the highway department."

This section says not a word about any discretion in the Commission. It does not even mention the Commission. It says that the engineer "shall proceed to cause surveys to be made of the *State Highway System* as designated in the foregoing section of this act." The only system mentioned is the one *created* and *established* in each of the 114 counties of the State. [Laws 1921 (1st Ex. Sess.) p. 145 et seq.] The right given by Section 30 is for the engineer to survey the whole State Highway System, and not such portions as might afterward be selected by the Commission for higher-type surfacing. The only other provision of Section 30 is the proviso

312 Mo. Sup.—19.

which says that if portions have theretofore been surveyed he shall use such surveys. But the vital error of my brother is that he draws discretion to the Commission from this section, when the Commission is not mentioned or hinted at. But even if the Commission had been named, the only authority given is to have surveyed the *state road system* as "created and established" by the law-makers. The law-makers add, by proviso, that; If you find portions of it already surveyed, use these surveys. All of it shows that the law-makers had in mind the preservation of the work (paid for by State and Federal funds) done under the Acts of 1917 and 1919. So careful were they as to this that they left portions of the Act of 1919, in force, until the present Commission could complete work begun under it. So it will be seen (reading the whole act) that the only discretion lodged in the Commission is that given by proviso one of Section 29. That discretion is not sufficient to authorize the Commission to eliminate the fixed points upon the routes. It can only mean, that between the places (cities, towns and villages) upon the established routes the Commission, in the interest of directness and economy, might make changes. No portion of Section 30, supra, authorizes the surveyor to miss a single town on the established routes. Had the law-makers intended such action, they would have said so in plain words. They have not done so, either in Section 30, or in the provisos to Section 29. To say that Section 30 gave a discretion to the Commission to leave off designated points is like "straining at a gnat, and swallowing a camel." Read the section. It does not even mention the Commission.

This opinion is longer than I anticipated, but my thorough conviction of my learned brother's error is my sole excuse. But another thought has impressed me and I add a paragraph.

By Section 28 of the Act of 1917 (Laws 1917, p. 487) the State Highway Engineer, subject to the approval, modification or rejection of the State Highway Board, selected the state roads. Existing roads might be utilized, or new locations made. Significant is this provision

in this section: "Such roads shall be selected with due regard to directness and persistence of routes, low grades, economy in construction and maintenance, probable volume of transportation, and general adaptation to the needs of the people of the county and State at large; provided, that each county in the State shall be included in the system of 'state roads.'" This law gave assent to the Act of Congress entitled, "An Act to Provide that the United States shall Aid the States in the Construction of Rural Post Roads and for other purposes," approved July 11, 1916.

The purpose of the United States Government was to reach the towns and their post offices. No intent expressed or implied to build air lines, leaving off the centers of population, whereat were located the post offices, in which the Federal Government was particularly interested, for the idea of the Federal Government was better roads upon which to transport its mail to post offices.

Sections 8, 8a, 8b and 8c of the Act of 1919 (Laws 1919, pp. 654, 655, 656 and 657) contain a like provision as the Act of 1917, and more. This Act of 1919 contemplated the building of not less than 6,000 miles of a State Highway System in the years 1919, 1920 and 1921. Section 10 of the Act of 1919 makes special provisions for other and additional roads to be constructed at the expense of the State, the Nation and the contributions of public-spirited citizens, and interested municipalities. The Act of 1919 did not limit the state-wide system to 6,000 miles, but provided that at least that mileage be built in the three years. These were not necessarily hard-surfaced roads, but they constituted the nucleus of the state road system. Large sums of money were expended upon those roads, so selected from town to town in the several counties of the State. Those locations and surveys were required to be filed with the Highway Department, and if these surveys be examined it will be found that the Legislature of 1921 (the act now before us) when it created the State Highway System, used these lo-

cated routes, and the cities and towns through which the divers routes passed, in establishing the highway system of 1921. Such body not only used the routes theretofore established, but designated the cities and towns through which they passed, possibly adding some new routes so that each county might have its proportion of the Highway System. The act then and thereby took from the Commission or its engineer the power to locate roads. This power had been exercised by the engineer, and the Highway Board under both of the previous laws, but no more of that by the Legislature of 1921. This Legislature designated the routes from town to town in each county, and so designated them as to form one consistent and connected system, and with a view that the Federal Government should have real post-roads for the money it expended; no roads running through corn-fields and dodging population centers whereat were the post offices.

So that we have first no power in this Commission to locate a single inch of road. They had already been located. Leaving out proviso one of Section 29 of the Act of 1921, there is not a syllable or line in the act conferring upon this Commission the power to locate new roads.

Then if we turn to the definition of a proviso, as found in the cases cited supra, we find it is a limitation upon a broad power previously granted in the act. If no power has been granted, there is nothing to limit. For this, as well as for the other reasons stated, the law-makers never contemplated throwing into the discard thousands upon thousands of the people's money, by allowing the present Commission to build air lines between a few populous cities.

I most respectfully dissent. *Walker, J.,* concurs in these views, and adds, in a separate opinion, some further views of his own.

WALKER, J. (dissenting).—Differing as I do from the reasoning employed and the conclusions reached in the opinions affirming the judgment of the trial court,

I deem it incumbent that the grounds of my difference should be stated that no doubt may exist, either in the legal or the lay mind as to the reasons for the same.

Prefatory thereto it may be pertinently observed that this is a suit of great importance to the general public or, as our vernacular tersely puts it, "the people."

The construction of a statute involving, as this proceeding does, the expenditure of a part of a burden of sixty millions of dollars created for the building of highways for the convenience and comfort of our citizens, and the defining of the duties and the limiting of the powers of the Commission charged with that expenditure, constitute subjects fraught with interest to every taxpayer. The right determination of the questions requires more than a literal interpretation of the terms of the law. Truly hath it been said that "the letter killeth but the spirit giveth life." It is meet, therefore, keeping in mind the hallmarks of interpretation, that we ascertain the spirit and purpose of the law and the limitations it imposes upon the exercise of the powers granted, which of necessity includes whatever authority may, under the statute, be exercised by the Highway Commission.

The object of this statute (Laws 1921, 1st Ex. Sess., pp. 131 et seq.), within the terms of which are embraced all the applicable law on the subject, is to provide for the construction and maintenance of roads throughout the State in the manner and along the routes designated in the act. Considered, not only in the light of this statute but in that of history and literature, a road means a public way by which persons, animals and vehicles may pass from place to place, or expressed in the more concise language of the law, a road is a place over which a right of way is enjoyed by the public, either by prescription or formal dedication. In the consideration, therefore, of the subject, the manner in which a way is established is entitled to emphasis. It has, during all recorded history, as Hilaire Beloc says, "constituted one of the great fundamental institutions of mankind." It

has served to materially aid in fixing the site of the centers of population, in determining the trend of trade and in facilitating the march of armies, Bacon, who, it will be recalled, said to his uncle Burleigh, that he "had taken all learning into his comprehension," in speaking of the factors necessary to the formation of a stable government, says: "A fertile soil with industry and an easy means of transportation for men and things from place to place, makes a nation strong and great." The wisdom of this truth has been practically recognized by every people who have risen from a nomadic and tribal condition to one of a high state of civilization, as exemplified by the governments they have established. Rome, although it built more to facilitate the transit of its armies, than for the convenience of its civilian population, was the great pioneer in road building. So durably were these roads constructed that despite the erosion of centuries their locations are still determinable. Especially is this true of the Appian and Flaminian ways. Both by comparison and contrast this illustration is relevant in the interpretation of the statute under review. The Romans built not for a day, a decade or a century, but for all time.

In the amendment of our organic law (Art. IV, sec. 44a), and in the enactment of the statute (Laws 1921, 1st Ex. Sess., supra), a like permanence of location and durability of construction were contemplated. The Roman engineers in the conquered outlying provinces built as the bee flies. They leveled the hills; made ways along the escarpments of mountains; filled depressions and built bridges over streams. In their original territory they followed the topography of the country so far as it enabled the centers of population along the routes to be reached. This course added to the convenience of the people as well as affording ways for the movements of armies. Roads are not built now with a view of facilitating the movement of armies, but for the convenience of the people liv-

ing in the territory through which the road is located. Centuries have passed since the great Roman highways were located and constructed. Civilization in the meantime has made great forward strides; and the unit we call man looms higher now in that intangible thing designated as the State than ever before. This fact becomes apparent to any one who examines the proceedings · of legislative assemblies. Therein the rights of men, individually and collectively, are, as they should be, given intelligent consideration. This is due to the fact that industrial and social life has in the past undergone and is still undergoing marked changes. At this day and time the Roman road, the width of which was from eight to fifteen feet and intended only for the transit of narrow tread chariots, soldiers mounted or on foot, and beasts of burden, would illy answer the purposes of a modern highway thronged with interurban busses, trucks, touring cars and other vehicles.. Notwithstanding the flight of time and the many changes in governments and the manner of living, the same dominating influences which have governed the location and created the purpose of ancient roads prevail today. Roads were always located for the convenience of the people, whether they were ·soldiers or civilians. To render this convenience more than a name roads were and are located, except in mountainous and marshy districts, through peopled sections, reaching wherever possible the centers of population along the route. The purpose of this manner of location is evident and has not been and is not now ignored, except by those ignorant of or indifferent to the practical reason why roads are built. In confirmation of this fact, even at the risk of prolixity, we have but to recall to the scholar the course pursued in locating and constructing the great highways we have named. Northerly from Rome ran the Flaminian and crossing the empire it reached its terminus on the Adriatic at Rimini; southerly from Rome ran the Appian to Brindisi on the strait of Otranto. Neither, except in sections not populated, was located along straight lines with cold indiffer-

ence to the purpose of all highways, the convenience of the people. This illustration need not for its confirmaation have been confined to the roads named. The history of the material development of every civilized country and the present locations of its roads add confirmation to the truth that in all time roads have been located and built with a controlling purpose to subserve the interests and promote the welfare of the people. The whim or caprice of an administrative board cannot, by flying in the face of a plain statute, effect this end or accomplish the purpose of its creation.

Literature charmingly adds its proof to that of history and actual knowledge as to the manner of locating highways here and elsewhere. No traveler who has with open eyes and a reflective mind, gone over any of the great thoroughfares in this country or abroad but will bear witness, not only to the convenience of travel, but to the interest aroused in meeting the people and the charm of the everchanging but always attractive landscapes. Whether we travel afoot with Goldsmith and his flute or with the ever interesting Bayard Taylor, or ride in a diligence with Smollett or Stern or loiter with Irving or Longfellow among classic ruins or by the side of sparkling streams or in quiet inns or quaint towns, we are confronted with the fact that the roads over which we have traveled were located, no matter how long ago, to benefit those who people the country through which they are built.

Our Legislature, familiar with the past history and the present purpose of locating and constructing roads and desirous of best serving the interests of the people, has provided in, what we deem, no uncertain terms (Sec. 26 and last paragraph of Sec. 29, Laws 1921, supra), that the Commission shall so locate the higher type of roads as "to connect the principal population centers in the State." The proper interpretation of this provision constitutes the vexing question upon which the members of this court differ. The writer and others contend, the words being plain, that they should be construed in har-

mony with the accepted meaning of the words employed
so as to effectuate the legislative intention (State ex rel.
v. Gmelich, 209 Mo. 1. c. 159; State ex rel. Marquette etc.
v. State Tax Commission, 282 Mo. 213); which intention
must be determined from a consideration of all of the
act (Grimes v. McReynolds, 188 Mo. 1. c. 689), so con-
strued that its various provisions may harmonize with
each other (In re Kinsella's Est., 239 S. W. (Mo.) 818),
giving to each a meaning and effect (State ex rel. King
v. Brd. Trustees, 184 S. W. (Mo.) 929), but bearing in
mind in the presence of and with the application of these
canons, that if the plain words above quoted need gloss
to determine their meaning, aid may be found in ascer-
taining the purpose for which the statute was enacted
(Buck v. St. L. Tr. Co., 267 Mo. 644; Lusk v. Pub. Serv.
Com., 272 Mo. 264).

Not only does the entire act demonstrate that its
controlling purpose is the convenience and as a conse-
quence the benefit of the people in the different portions
of the State through which the roads are required to be
built, but this purpose is evident from the language of the
constitutional amendment authorizing the creation of
the bonded debt and the statutes prescribing the man-
ner in which the funds arising from the sale of the bonds
is to be expended. If such be the dominating purpose of
this entire legislation the meaning to be given to the
act under review must be in harmony with that purpose.

While not necessary to the determination of the mat-
ter at issue, it is not wholly irrelevant to say, it is the
opinion of the writer, that it was the intention of the
Legislature, while not so expressed, that highways built
and improved under this act should, wherever possible,
be located along the lines and over the rights of way of
roads now in existence and long established. The por-
tion of the act prescribing the courses of primary roads
is evidence of the correctness of this conclusion. But
more to the point. What is meant by the unequivocal re-
quirement of the act (Secs. 26 and 29) that the primary
roads shall be constructed so as "to connect the princi-

pal centers of population in the State"? Notably, in this case, the county seats of the different counties were within the contemplation of the act. There the business of the county—which at times has to do with citizens in different sections of same—is transacted; there the principal commercial and industrial enterprises are conducted; and the educational advantages and opportunities for social intercourse are greater than in a rural district. The promoting causes for the congregation of the people at such places are evident. In each is to be found a greater number of people than in any other section of the county. Can it be said then, if the roads authorized to be constructed under this act, are to add to the convenience and promote the comfort of the people and a single one of these centers of population has been passed by, that the law has been rightly interpreted and its purpose promoted?

II. This brings us to a consideration of the power of the Highway Commission; purely statutory in origin, its right to exist and authority to act must be found in the statute of its creation. The character of its power is administrative and its right to exercise the same must be clearly defined, accompanied only by such reasonable discretion as is necessary to effectually perform the duties enjoined. This limitation is always applicable in defining the powers of boards of the character of the Commission. The people, acting through the Legislature, is the sovereign; the Commission is the subject and the statute is the charter of its power. Any duty enjoined therein is not permissive unless so declared, but its performance in the manner indicated is mandatory. This fact is given emphatic force in defining the course required to be pursued by the Commission in locating and constructing the road in question. Not content with declaring that the primary roads should be located and built so as to connect the population centers in the State, the Legislature evidently wary of the vesting of general discretion in a body of purely statutory creation, went further and em-

phasized the route to be pursued in the location of this road. We are mindful here only with its course so far as concerns the counties of Boone, Callaway, Montgomery, Warren and St. Charles. That course, as defined in the act, is as follows: "Beginning on the Missouri river at Rocheport, thence east through Columbia to the Callaway-Boone county line west of Millersburg;" "Beginning at the Callaway-Boone county line near Millersburg, thence south and east through Millersburg to Fulton, thence north and east through Calwood to Williamsburg to the Callaway-Montgomery county line;" "Beginning at the Montgomery-Callaway county line west of Mineola, thence easterly to Mineola, thence northeasterly to Danville, thence south and east through High Hill and Jonesburg to the Montgomery-Warren county line;" "Beginning at the Warren-Montgomery county line near Jonesburg, thence south and east through Warrenton to the Warren-St. Charles county line;" "Beginning at the Warren-St. Charles county line east of Warrenton, thence in an easterly direction to St. Charles." The course as thus prescribed constitutes a mandate and the Commission has no other alternative than to follow it. Neglect or refusal so to do is in excess of any power granted or implied and is a violation of the law. These portions of the act, included in the various paragraphs of. Section 29, constitute an imperative construction of the provisions requiring the road to be located and built so as to connect the centers of population; and, as we have intimated, it is not necessary to determine whether the act requires the road to be built along or upon the road already established. In the presence of mandatory statutes, not only couched as we have shown in express terms, but accompanied by a detailed statement covering each of the counties and designating the centers of population, there is no room left for latitudinary construction and a reliance upon implied discretion to justify the Commission's neglect or refusal to comply with the law. What the Legislature meant by the act under review has been discussed in detail by my brother GRAVES, and in this interpretation

of same I concur. I have been content with the discussion and determination of the purpose of the Legislature in the creation of the act and the power of the Commission thereunder. Satisfied as to the correctness of my conclusions it follows as a logical sequence that all of the powers granted must be construed as subservient to that purpose. In short, the statute was enacted, as someone has said in regard to the delightful English roads, to provide "good broad highways leading down from shire to shire and town to town." This accomplished in the manner required by the act and the work of the Commission is performed. Otherwise not. I therefore dissent.